Daniel, J.
The full delivery of the salt in controversy by Neville or his agents, to Howery, the person authorized by Arnold to receive it, is clearly established by the testimony of Howery. Possession of the salt was acquired, and its removal from the demised premises into the boat of Arnold, effected in an open and public manner; Howery, according to his statement, having been engaged three days in loading the boat with it. The inference is irresistible that it was delivered by Neville, in pursuance of the written agreement between him and Arnold of the 22d of July 1846. *459 This agreement was thus completely executed, so far as the salt in question was concerned, and nothing remained to be done in order to perfect the transfer of full ownership in it.
It is true that in this agreement there is full recognition by Arnold of the relation of landlord and tenant subsisting between Lewis and Neville, and an express exception out of the contract by the latter to deliver Arnold all the salt he should make during the year, of so much as might become due to Lewis on account of his rent. And if, therefore, such a transaction as that which occurred between Lewis and Howery, had occurred between Lewis and Arnold, and the conduct of the latter had been in all regards the same with that of Howery, I am not prepared to say that there would not have been much show of force in the position taken by the counsel of Lewis here. In such a supposed state of things the inference would have been strong, that Arnold, whatever might be his strict legal rights in the controversy, had acquiesced in the claim of Lewis; and in such a case there might have been an apparent injustice in allowing him afterwards to visit Lewis with a loss that might not have occurred but for his seeming acquiescence. But I can see no ground for holding that Arnold is to be held bound by the conduct of Howery. The agency of the latter was of the most special and limited character. He was the mere servant or hireling of Arnold, charged with the simple duty of receiving the salt, loading the boat with it and carrying it down the river to market for Arnold. He was clothed with no powers which could make his admissions, express or implied, of the justice of Lewis5 claim, binding on Arnold. If, therefore, from his statement that he left the boat in consequence of what was said by the sheriff as he was on the eve of starting with his boat, it is to be inferred that he believed in the statements made by Lewis and the sheriff, and acknow *460 ledged their right to take the salt for rent, it is difficult to perceive by what rule of law it is to be maintained that such inference can be brought to bear on the rights of Arnold.
Let it be that Howery had full faith in the declaration of Lewis, that “he had a landlord’s warrant or would get one to take the salt for rent,” and in the announcement made by the sheriff on his arrival soon thereafter, that “ he had a landlord’s warrant, or notice, or something of the kindand that in leaving the boat he designed a surrender of his charge to the challenge of what he supposed to be a rightful claim and a lawful authority, still it is obvious that such conduct cannot stand in a controversy between Lewis and Arnold, as the substitute for proof, by Lewis, of the justice of his claim, nor dispense with the exhibition by him of the process by means of which he threatened to enforce it.
There is nothing in the exception or proviso to the agreement between Arnold and Neville, from which to infer a duty on the part of the former to see, on every occasion of receiving salt from the furnace, that a sufficiency of salt was left to discharge the rent to be paid by Neville. The whole effect of the reservation was to give Neville the right to retain, out of the whole quantity made during the year, a sufficiency for that purpose. There is no proof of any specific amount of rent due to Lewis; no proof that he or the sheriff' was armed with any legal authority to make a levy on the salt; no proof that the salt in controversy had been set apart by Neville for the purpose of satisfying the rent, nor that a sufficiency to pay the rent was not left on the leased premises; no proof of collusion between Neville and Arnold in fraud of the rights of Lewis. But we are called on to infer all that is essential to show a superior right in Lewis, from the exhibition of the lease between him and his *461 tenant, the agreement between Arnold and Neville showing that the former had notice of the terms of the lease, and from the fact that Lewis took possession of the salt with the assertion of a lawful right to take it to satisfy his demands as landlord. We should have to reverse all the rules applicable to demurrers to evidence before we could allow a defense constructed out of such elements alone, to stand in the way of the plaintiff’s recovery. The Circuit court therefore did not err, as it seems to me, in rendering a judgment on the verdict for the plaintiff. It is contended, however, that the judgment was wrong in allowing interest on the damages, conditionally assessed by the jury, from the date of the verdict.
By the 14th section of chapter 177 of the Code of 1S49, p. 673, it is declared that the jury in any action founded on contract may allow interest on the principal due, or any part thereof, and fix the period at which such interest is to commence. And in any action for a cause arising thereafter, whether from contract or from tort, the jury may allow interest on the sum found by the verdict, or any part thereof, and fix the period at which the said interest shall commence. And if a verdict be rendered thereafter, which does not allow interest, the sum thereby found shall bear interest from its date, whether the cause of action arose theretofore or shall arise thereafter; and judgment shall be entered accordingly.
It is conceded by the counsel of the plaintiff in error, that the terms of the last clause of this section are sufficiently broad to cover the case; and he also concedes that the judgment is, in the particular in question, in conformity with the judgment rendered by this court in the case of Hepburn v. Dundas, supra 219. He contends, however, that the terms of said clause, if sought to be applied to verdicts rendered in actions pending at the date of the act, must be controlled by *462 the provisions of the 18th section of chapter 16, p. 101, and the first and second sections of chapter 216, p. 800, the last chapter of the Code. He calls attention to the fact that in the petition for the appeal in the case just mentioned, no such question is presented, and also to the further fact that in the written opinion of the court no reference is made to these provisions ; and he insists that under such circumstances the question should not be regarded as concluded by the decision made in that case.
The provisions of the section to which the counsel first refers us are, that no new law shall be construed to repeal a former law as to any offence committed against the former law, nor as to any act done, any penalty, forfeiture or punishment incurred, or any right accrued, or claim arising under the former law, or in any way whatever to affect any such offence or act so committed or done, or any penalty, forfeiture or punishment so incurred, or any right accrued or claim arising before the new law takes effect; save only that the proceedings thereafter had shall conform, so far as practicable, to the law in force at the time of such proceedings. And by the first and second sections of the last chapter of the Code it is declared, that all the provisions of the preceding chapter shall be in force upon and after the first day of July next (after the passage of the act;) and that all acts and parts of acts of a general nature in force at the time of the passage of the act, shall be repealed from and after the said first day of July next, with such limitations and exceptions as are already in the previous provisions of the Code, or in the said chapter thereafter expressed; and that such repeal is not to affect any offence or act committed or done or any penalty or forfeiture incurred, or any right established, accrued or accruing before the said first day of July, on any prosecution, suit or proceeding pending on that day, *463 except that the proceedings thereafter had shall conform, so far as practicable, to the provisions of the act.
There is no conceivable reason why the legislature should have made any distinction in the particular under consideration, as affecting the parties thereto, between actions pending and actions thereafter to be brought on causes of action already existing; inasmuch as it is obvious that this new incident to, or consequence of, the verdict could be as effectually avoided by a defendant in the one case as in the other. The true point of objection (if any) to the clause in question is, that it attaches to a cause of action already existing, a consequence which under the former law did not belong to it, the defendant not being compellable by any former law in case of a verdict for damages assessed in actions for tort, to pay interest thereon from the date of the verdict. But I do not think that in this respect the clause stands in any respect opposed to the spirit of these general regulations.
No one who has inflicted injury by the commission of a tort can be properly said to have an established right to withhold for any space of time the measure of reparation ascertained by the verdict of a jury to be due to the injured party. The justice of requiring the prompt payment of the sum which may be assessed by a jury in such case, and of allowing the party injured to receive, and of compelling the party withholding to pay, a fair compensation for retaining it, is just as clear as it is to make a similar requisition of one who is found to be the debtor of another by contract. And when it is entirely within the power of the wrongdoer wholly to avoid the new consequence which the clause in question attaches to the verdict, (as it is, by the prompt discharge of the damages,) I cannot see how the law can be said to be objectionable as being of a retrospective character.
It is to be observed further that the act existing at *464 the date of the Code in respect to the allowance of interest by the jury, embraced only actions founded on and directed that the jury should, after ascertaining the principal sum due, fix the period at which interest should commence, if interest should be allowed by them ; and that judgment should be rendered accordingly, carrying on the interest till the judgment should be satisfied. This provision though repealed, by the general repeal of all acts then in force, in the last chapter of the Code, is, as we have seen, in effect substituted by the first clause of the 14th section of chapter 177. In respect to actions founded on tort, there was, at the date of the passage of the Code, no act of assembly either directing or forbidding the jury to allow interest on the damages, or prescribing whether interest should or should not go on the damages assessed by the jury in such cases, where the verdicts did not allow interest. These matters were regulated by the common law. In respect to them there was, therefore, no act of assembly to be repealed: And consequently, the clause in question does not come within the terms of the last chapter of the Code declaring the repeal of “ all acts and parts of acts” of a general nature.
So far as the said clause declares a new rule in conflict with the common law, it does so in terms definite and precise, leaving nothing for a general rule of construction to operate upon. It ascertains clearly the right to the interest as an incident to every verdict to be thereafter rendered, which does not allow interest, whether the cause of action arose theretofore or shall arise thereafter; makes no distinction between suits pending or thereafter to be brought; fixes the date of the verdict as the period from which the interest is to run, and declares that judgment shall be rendered accordingly. It neither needs nor admits of a reference to any general provision to explain or declare on what *465 rights it was designed to operate, or what suits it was designed to affect. It carries with it its own construction. And to bring the general regulations in question, understood as they are by the counsel of the plaintiff in error, to bear upon it, would be to make the law contradict itself in some of its most important provisions; provisions in which it has used language of the most positive and unequivocal character. On the operation and effect of such a law it is plain these general regulations can, from the very nature of the subject and the objects contemplated, have no control.
There is, however, a plain mistake or error in the verdict and judgment, to the prejudice of the plaintiff in error, to the extent of thirty-three dollars and forty-nine cents; the amount of damages claimed in the declaration being eight hundred dollars, whilst the verdict and judgment have been rendered for eight hundred and thirty-three dollars and forty-nine cents. By the sixth section of chapter 181 of the Code of 1849, it is made the duty of the Court of appeals in . cases of this kind to amend the judgment in such particular, and then to affirm the judgment, if there be no other error. Under the former law, § 110, ch. 128, Bev. Code, it was the duty of this court in such case to reverse the judgment of the court below on account of the error, and then to proceed to give such judgment as the court below ought to have given. And here again the counsel for the plaintiff in error insists that under the requirements of the general provisions of the Code already commented on, we ought to conform our judgment to the requirements of the former law. The want of any applicability of these provisions, and the absence of all right in the plaintiff in error to ask their application, is, if any thing, more obvious in this enquiry than they were in the one just disposed of.
*466 If the writ of error had been pending when the Code took effect, there would be a show of propriety in contending that the plaintiff should not by the new law be burdened with the costs of correcting an error which, as the law stood when he sued out the writ, he had a right, an inchoate right, to have corrected at the costs of his adversary. But his position is just the reverse of that supposed. The writ of error, his (the plaintiff’s in error) own suit, has been instituted since the Code took effect. Not only so ; but the cause of action on which it is founded, viz: the error committed in the verdict and judgment rendered in the Circuit court, did not arise till after the new law came into operation. The new law does not sanction this error, nor give to the plaintiff in the original action, which was pending when the new law took effect, a right to recover of the plaintiff in error larger damages than he had a right to recover by the former law. So far from it, whilst it repeals (as is true) the former laws regulating the correction of such errors, it at the same time substitutes in their place new provisions equally efficacious; and in fact gives to the plaintiff in error an additional means of obtaining relief, viz: by motion to the Circuit court. By pursuing that remedy, instead of the one selected, he might have saved himself as well as his adversary the expense and delay that have been encountered in this court. Having refused to avail himself of the cheaper remedy, he ought not to be heard to complain of the rule which requires him to pay the expenses of the more costly one of which he has chosen to avail himself.
No precedent can be found going to the length ■of condemning, as retrospective, laws which merely ■change the remedies for existing rights. And it would be carrying the doctrine of the inviolability of vested rights to an extent far beyond the real purpose of any *467 constitutional provision, and the true object and scope of the general regulations in question, to hold that a party to a pending suit has such an established right to the then existing remedy for the correction of errors, as that an error which may be committed thereafter in the progress of the suit, cannot be made the subject of a new law regulating the costs of the proceedings to correct the error in the appellate court.
It is not necessary to consider the questions which were raised in the Circuit court by the demurrer to the first counts in the declaration, inasmuch as the evidence obviously applies only to the case stated in the last count, which, it is conceded, is in all respects good.
There is, I think, no error in the judgment, except that which was committed in rendering judgment for a sum exceeding that laid in the declaration. This error ought to be corrected, and the judgment of the Circuit court then affirmed.
The other judges concurred in the opinion of Daniel, J.

Judgment amended and affirmed, with costs and damages.